UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HAGENS BERMAN SOBOL SHAPIRO LLP,

    Plaintiff,

v.

ERAN RUBINSTEIN and SUSAN M. BOLTZ RUBINSTEIN,

    Defendants.

CASE NO. C09-894 RSM

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## **I. INTRODUCTION**

This matter comes before the Court on Plaintiff's Motion for Temporary Restraining Order which the Court has construed as a Motion for Preliminary Injunction. (Dkt. #3). Plaintiff argues that immediate injunctive relief is necessary to protect themselves from Defendants' unauthorized solicitation of third-party entities, thereby precluding Plaintiff from fulfilling their legal and ethical obligations. Plaintiff also argues that injunctive relief is necessary to protect innocent nonparties whom Defendants may have misled into believing that Plaintiff represents them.

Defendants respond that an injunction should not issue because this action was improperly filed as an anticipatory defense to a well-documented prospective breach of

ORDER
PAGE - 1

contract claim in their favor. Defendants further claim that Plaintiff cannot show success on the merits, irreparable harm, or that the balance of the hardships tips in their favor.

For the reasons set forth below, the Court GRANTS IN PART Plaintiff's motion.

## **II. DISCUSSION**

### **A. Background**

The instant lawsuit arises out of a failed business relationship between Plaintiff Hagens Berman Sobol Shapiro LLP ("Hagens Berman"), a law firm based in Seattle with offices nationwide, and Defendants Eran and Susan Rubinstein, two attorneys who currently reside in Pennsylvania and appear in this action *pro se*.

In the summer of 2008, the Rubinsteins approached Reed Kathrein and Steve Berman, two partners at Hagens Berman, to assist the firm in representing international institutional investors in securities matters. The Rubinsteins apparently had extensive contacts throughout the world, including Israel, Ireland, South Africa, and the United Kingdom. The Rubinsteins represented to Hagens Berman that these contacts would ultimately bolster Hagens Berman's securities class-action practice. As a result, the parties reached an agreement through a Memorandum of Understanding ("MOU"), effective July 30, 2008, wherein the Rubinsteins were hired as "of counsel" at Hagens Berman for an initial period of 12 months.

The MOU specifically provided that the "Rubinstein's primary duties will be international institutional client outreach, client maintenance and case identification and analysis." (Dkt. # 5, Decl. of Berman, Ex. A, § B). The MOU also indicated that the Rubinsteins would "be the 'primary point of contact' with clients which they have currently or with whom they establish primary relations during the course of this agreement. This means that all communications with the Rubinstein clients will be at the direction or permission of Rubinstein." (*Id*., § C).

In exchange, the Rubinsteins would be paid $30,000 a month for a period of one year by Hagens Berman. The Rubinsteins were also to be reimbursed for up to $50,000 in travelling expenses for the duration of the MOU, with the potential for additional reimbursement subject to Hagens Berman's approval.

Unfortunately, the relationship quickly deteriorated and became extremely contentious. According to Hagens Berman, the Rubinsteins did not appear to have the extensive contacts in the countries mentioned above. Instead, the Rubinsteins pursued contacts in Australia by January of 2009. After Hagens Berman learned of this decision, Mr. Berman, managing partner of Hagens Berman and head of its Executive Committee, asked the Rubinsteins to identify the entities they had contacted. Mr. Berman alleges that the Rubinsteins did not comply, thereby precluding the firm from performing their due diligence and determining whether these entities could become clients.

Hagens Berman further indicates that since February of 2009, they have made numerous requests to the Rubinsteins to identify these clients to no avail. It appears that the Rubinsteins withheld this information due to their belief that Mr. Berman was unfairly attempting to negotiate contracts with the Australian entities through a third party. In essence, the Rubinsteins accuse Mr. Berman of using them to gain access to their clients, rather than allowing the Rubinsteins to develop cases on their own in violation of the MOU.

Once the Rubinsteins confronted Mr. Berman about these potential contacts, the Rubinsteins allege that Mr. Berman denied such third-party communications. They further claim that Mr. Berman began unilaterally severing the terms of the MOU beginning in March of 2009, and "started a campaign of retaliatory harassment accusing us of nonperformance under the contract while at the same time creating impediments to our performance and attempting to stall us from going to see our clients." (Dkt. #11 at 11). The Rubinsteins claim that this included: (1) threats by Mr. Berman that he would take legal action; (2) interference with their role in case prosecution by locking them out of the firm billing system and canceling their corporate-issued credit card; and (3) unreasonable requests to obtain preauthorization for travel expenses.

The relationship weakened to the point where the Rubinsteins obtained counsel, Nino Tinari, to represent their interests. The Rubinsteins also contacted Tom Sobol, a Hagens Berman partner in Boston, to intervene on two separate occasion. Mr. Sobol did not intervene.

The Rubinsteins also lodged a disciplinary action with the Washington State Bar Association ("WSBA") on April 4, 2009. It appears that the Rubinsteins seek Mr. Berman's disqualification from the case involving the Australian entities based on his failure to inform the Rubinsteins about his third-party contacts, his alienation of the Rubinsteins from the rest of Hagens Berman, a proposed letter to clients drafted by Mr. Berman to create insecurities in clients, and his act of disconnecting the Rubinsteins from firm resources. This disciplinary action remains pending.

The relationship reached a boiling point on June 23, 2009, when the Rubinsteins provided Mr. Sobol with three, signed "Contingent Fee Agreement[s] for Multi-Plaintiff Group Claims."[1] The agreements purported to bind Hagens Berman to three Australian entities. Mr. Tinari subsequently wrote to Hagens Berman Executive Committee members Mr. Sobol, Tony Shapiro, and Robert Carey that the firm would "receive approximately fifty five (55) signed retainer agreements from Australian institutional investors." (Decl. of Berman, Ex. V). Mr. Tinari's letter also threatened the Executive Committee that:

> I have advised [the Rubinsteins] that, should you continue to refuse to engage with them towards case prosecution within forty-eight (48) hours of your receipt of this correspondence, they would bring this matter to the immediate attention of your respective Disciplinary Boards.

(*Id.*).

Shortly after the Rubinsteins submitted this correspondence, Hagens Berman terminated the Rubinsteins' employment on or around July 1, 2009.

Significantly, the Australian entities that the Rubinsteins had purportedly established contacts with had substantial implications for Hagens Berman's securities litigation practice. It appears that the Rubinsteins offered contingent fee legal services to between three and 308 Australian institutional investors, including local councils, universities, religious and charitable organizations, and private companies. All these entities lost money because of

---

[1] The Rubinsteins indicate that they provided Mr. Sobol with seven signed retainers. (Dkt. #11 at 21).

ORDER
PAGE - 4

alleged wrongdoing by credit rating agencies and others. The Rubinsteins estimate the investors' loss exposure at $500,000,000 to $700,000,000.

As a result of the Rubinsteins' alleged refusal to provide Hagens Berman with the information they requested regarding the Rubinsteins' potential clients, Hagens Berman filed a motion for temporary restraining order in this Court on July 14, 2009.[2] The Court found that Hagens Berman failed to meet the requirements of a TRO without notice pursuant to FRCP 65, and allowed the Rubinsteins to respond. The Court construed the motion as one for a preliminary injunction, and set an expedited briefing schedule.

Hagens Berman now seeks an order from the Court requiring the Rubinsteins to:

(1) Cease and desist from representing to any person or entity that they have any affiliation with or authority to speak or act on behalf of Hagens Berman;

(2) Provide within three (3) days the name, address, e-mail address and contact person(s) for each Australian entity with which the Rubinsteins believe they have established an attorney-client relationship, or to which they have communicated an offer of potential representation or spoken about potential representation while associated with the firm;

(3) Produce within three (3) days copies of all documents referring or relating to any communications between the Rubinsteins and each purported Australian client or prospective client, including but not limited to e-mails, memoranda, letter, and draft and signed retainer agreements;

(4) Preserve all documents relating to their activities in relation to Hagens Berman; and

(5) Make themselves available in Seattle within seven (7) days for depositions covering the foregoing topics without prejudice to the right of the firm to take their depositions on the merits of the case at a later time.

(Dkt. #3, Prop. Order at 2-3).

One week after Hagens Berman filed the instant lawsuit in this Court, the Rubinsteins filed a lawsuit in Bucks County, Pennsylvania. Hagens Berman removed the case to the United States District Court for the Eastern District of Pennsylvania, and has moved to dismiss, stay, or transfer the case to this Court. (Dkt. #13, Decl. of Berman, Exs. B and C).

---

[2] Hagens Berman initially filed its initial complaint in this Court on June 30, 2009. It filed an amended complaint simultaneously with its TRO motion. (*See* Dkt. #2).

The Rubinsteins also filed a motion in this Court to dismiss, stay, or transfer this case to the Eastern District of Pennsylvania on July 28, 2009. (Dkt. #17).

**B. Preliminary Injunction**

In order to obtain injunctive relief, the party seeking the injunction must demonstrate that "he is *likely* to succeed on the merits [and] that he is *likely* to suffer irreparable harm in the absence of preliminary relief." *Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365, 374 (2008) (emphasis added). The Supreme Court recently imposed this new standard that clarifies the contours of the test previously employed by the Ninth Circuit. This former test required a party seeking an injunction to show "probable" success on the merits and the "possibility" of irreparable harm. *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).

Despite this change, the well-recognized "sliding scale" approach to injunctive relief remains intact. *See Winter*, 129 S.Ct. at 393 (J. Ginsburg, dissenting) ("This Court has never rejected [the sliding scale] formulation, and I do not believe it does so today."). This approach requires courts to view success on the merits and irreparable harm as "two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Napster*, 239 F.3d at 1013 (internal citation and quotation omitted). In other words, the greater the relative hardship to the party seeking the injunction, the less the probability of success must be shown, and vice versa. *See Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003).

A plaintiff seeking a preliminary injunction must also show "that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 129 S.Ct. at 374 (citations omitted). "Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal." *Wilderness Workshop v. U.S. Bureau of Land Management*, 531 F.3d 1220, 1224 (10th Cir. 2008) (citation omitted). The Court addresses each factor in turn.

### 1. Irreparable Injury

As mentioned above, the alleged injury must be likely. *Winter*, 129 S.Ct. at 374. The Ninth Circuit has also indicated that the injury must be imminent. *Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674-75 (9th Cir. 1988) (citation omitted). The showing of irreparable harm is considered "the single most important prerequisite for the issuance of a preliminary injunction." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (collecting cases).

Here, the Court unequivocally finds that Hagens Berman has shown the existence of irreparable harm. As the Rubinsteins do not dispute, they submitted at least three separate retainer agreements purporting to bind Hagens Berman to certain Australian entities on June 23, 2009. They further indicated to Hagens Berman that "[i]t has been predicted that we will receive approximately fifty (50) more retainer agreements." (Dkt. #11, Joint Decl. of Eran and Susan Rubinstein, Ex. KK). The Rubinsteins' attorney, Mr. Tinari, supplemented this correspondence by indicating that same day that the Rubinsteins expected approximately 55 retainer agreements. (*See* Decl. of Berman, Ex. V). However, the Rubinsteins have failed to disclose the identity of these clients. Therefore there can be no dispute that Hagens Berman is currently in the dark about what entities the Rubinsteins purportedly bound them to.

The Rubinsteins nonetheless claim that Hagens Berman has all the information it needs to contact the Australian investors. This contention is without merit. In each and every instance the Rubinsteins claim in their pleadings that they provided Hagens Berman with a client list, the Court is unable to locate any direct evidence that they provided Hagens Berman with such a list. In addition, there is no clear or direct acknowledgement from Hagens Berman that they received such a list. It appears that at this time, the only information ever provided to Hagens Berman by the Rubinsteins is a list of 308 institutions that allegedly lost money. However, no contact information was provided for any of these institutions. The Rubinsteins fail to explain why it is the responsibility of Hagens Berman to locate these institutions themselves.

Furthermore, Hagens Berman faces potential ethics violations if they continue to be unaware of the identity of these clients, because a series of professional rules are implicated in this case. For example, a fundamental canon of ethics reflected in Washington Rule of Professional Conduct 1.3 requires a lawyer to "act with reasonable diligence and promptness in representing a client." WA RPC 1.3. Failure to know the identity of such a client would obviously constitute a breach of this rule. Washington RPC 1.2(c) also indicates that "[a] lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent." WA RPC 1.2(c). Washington RPC 1.4(b) further indicates that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." WA RPC 1.4(b). Hagens Berman faces violations of each of these rules if they do not know which entities the Rubinsteins have bound them to.

The Court also agrees with Hagens Berman's contentions that the need for such information is particularly compelling where a departing lawyer possesses the information. Pursuant to Washington RPC 1.18, law firms and attorneys have continuing duties to potential clients even when no attorney-client relationship is established. *See* WA RPC 1.18(b). Thus, in order to meet these responsibilities, Hagens Berman must be aware of the scope and depth of the Rubinsteins' communications with the Australian investors. As Professor David Boerner – an expert in the field of ethics – indicates, "the law firm must be aware of what information was communicated by the prospective client to the lawyer and what the lawyer told the prospective client." (Dkt. #4, Decl. of Boerner, ¶ 5). The Court finds merit in his contention that "[t]he law firm must be aware of both the identity of all the persons or entities whom the departing lawyer interacted with while the departing lawyer was affiliated with the law firm as well as the nature of that interaction." (*Id*.).

The need for an injunction based on irreparable harm is further exemplified by both parties' acknowledgement that statutes of limitation are running on the potential claims of the Australian investors. Hagens Berman's failure to address their own putative clients could potentially expose them to malpractice claims.

The Rubinsteins attempt to downplay the irreparable harm that may result if they fail to disclose such information on the grounds that Hagens Berman has no desire in representing the Australian investors. They also suggest that the retainer agreements they submitted are voidable at any time by either Hagens Berman or the client, and that they have already counseled each client that they have severed ties with Hagens Berman. These arguments miss the point. The fact that Hagens Berman is unaware of who may be bound to them in the first instance is the source of their harm.

In short, there is seemingly no dispute that Hagens Berman is not directly aware of which entities the Rubinsteins potentially bound them to. Moreover, the conduct complained of occurred when the Rubinsteins were employed as "of counsel" attorneys at Hagens Berman. Therefore Hagens Berman faces irreparable harm in the form of serious ethical violations if they are not provided with this information.

### 2. Success on the Merits

The Court finds that Hagens Berman has shown that it will succeed on the merits. As discussed above, law firms certainly have a fundamental right to know which clients their attorneys are binding them to in order to fulfill their legal and ethical obligations to such clients. Hagens Berman has an unequivocal right to demand that this information be revealed in order for them to perform their due diligence.

Nevertheless, the Rubinsteins argue that they have a valid breach of contract claim against Hagens Berman. They suggest that they have fully performed under the agreement at-issue, whereas Mr. Berman has unilaterally severed the terms of the parties' MOU.

However, an agent's authority "may be terminated by . . . a manifestation of revocation by the principal to the agent[.]" Restatement (Third) of Agency § 3.06 (2006). "The power to terminate *does not depend on the existence of or conformity with an agreement* between the agent and the principal." *Id.*, cmt. c (emphasis added). "It makes no difference whether [a principal's] termination was rightful or wrongful, for in either case [an agent's] only remaining right [is] to claim damages against [the principal] for breach of contract." *Debenedictis v. Hagen*, 77 Wn. App. 284, 292 (1995).

Based on these legal principles, it is clear that Hagens Berman's right to this information is *separate and independent* of whether the Rubinsteins have a valid breach of contract claim. As Hagens Berman correctly describes, the purpose of this motion "is to prevent unwarranted reliance by potential foreign plaintiffs and to facilitate protecting or mitigating their situations." (Dkt. #12 at 12). Thus, the limited relief sought by the instant motion has no bearing on whether a valid breach of contract claim exists by either party. The central issue raised by this motion is whether Hagens Berman is justified in requesting the information it seeks. Relatedly, to the extent that the Rubinsteins claim that Mr. Berman simply used their client contacts with no genuine intention to retain the Rubinsteins, the mode of redress with respect to this allegation is also through a breach of contract claim.

The Rubinsteins also imply that under § C of the MOU, they alone are entitled to communicate with existing or potential clients. This argument is equally without merit. Although § C of the MOU indicates that the Rubinsteins "will be the 'primary point of contact' with clients which they have currently or with whom they establish primary relations during the course of this agreement," (Decl. of Berman, Ex. A, § C), a fundamental prerequisite to becoming a client undoubtedly requires approval by Hagens Berman. Indeed, the Rubinsteins fail to identify anywhere in the agreement that they alone have been given the unilateral authority to determine what information it can withhold from the rest of its law firm. The Court reminds the Rubinsteins that it was they themselves that entered into the contract with Hagens Berman to bolster Hagens Berman's securities litigation practice.

The Court also finds no merit in the Rubinsteins' arguments that the instant motion is simply an attempt to circumvent their position as natural plaintiffs in this case. In this regard, they claim that they have previously filed a bar grievance described above against Mr. Berman, and that they have also filed a breach of contract claim in Pennsylvania.

With respect to the bar grievance, Washington Rules for Enforcement of Lawyer Conduct 5.3(c) suggests that disciplinary counsel may defer an investigation into alleged acts of misconduct by a lawyer if it appears that the allegations are related to a pending civil

litigation. *See* WA ELC 5.3(c)(1)(A). Therefore there is no reason for this Court to stay or otherwise defer ruling on this motion due to a pending bar complaint filed by the Rubinsteins.

With respect to the breach of contract claim in Pennsylvania, the Rubinsteins cannot deny that they filed that claim one week after Hagens Berman filed the instant lawsuit in this Court. "There is a generally recognized doctrine of federal comity which permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district." *Pacesetter Systems, Inc v. Medtronic, Inc.*, 678 F.2d 93, 94-95 (9th Cir. 1982) (citations omitted). This rule, otherwise known as the "first-to-file" rule, "was developed to serve the purpose of promoting efficiency well and should not be disregarded lightly." *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 625 (9th Cir. 1991) (internal quotations and citations omitted). The rule would apply in this case.

The Court finds that Hagens Berman has shown that it will succeed on the merits insofar as its motion relates to its right to acquire the information at-issue. The Rubinsteins wholly fail to offer any legal justification otherwise.

### 3. Balance of Hardships and Public Interest

The Court additionally finds that the balance of the hardships clearly weighs in favor of Hagens Berman. The Rubinsteins possess the information Hagens Berman needs to fulfill its ethical responsibilities. Without such information, the firm has no means of identifying which entities are already bound to Hagens Berman, and which entities may potentially be under the mistaken belief that they are clients of Hagens Berman. This information is vital to protect the claims of Australian investors whose damages are estimated in the hundreds of millions.

For these very same reasons, public interests are served by requiring the Rubinsteins to disclose this information to Hagens Berman. *See*, *e.g.*, *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (subsuming the public interest factor into the balancing of the hardships); *see also Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002) ("The public interest inquiry primarily addresses impact on non-parties

rather than parties."). The Rubinsteins' continual withholding of the information at-issue has substantial implications to the Australian investors and their potential claims.

Ultimately, and from a practical perspective, the Court finds the Rubinsteins' position in this case to be nonsensical. A law firm certainly has the right to know what entities its lawyers are binding them to. Without such information, a law firm has no way of determining the scope of any potential or existing representation. Again, whether the Rubinsteins have a valid breach of contract claim is a wholly independent inquiry.

### C. Plaintiff's Proposed Order

Based on the reasoning above, the Court finds that a preliminary injunction shall issue in favor of Hagens Berman. The Rubinsteins are directed to comply with the instructions set forth in Hagens Berman's proposed order, with the exception of the fifth item listed in the proposed order, which requires the Rubinsteins to make themselves available in Seattle within seven days for depositions. (*See* Dkt. #3, Prop. Order at 2-3). The Court finds that items one through four of the proposed order will sufficiently ameliorate any and all legal and ethical concerns facing Hagens Berman at this time.

### III. CONCLUSION

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Plaintiff's Motion for Preliminary Injunction (Dkt. #3) is GRANTED IN PART. Defendants are DIRECTED to comply with parts one through four of Plaintiff's proposed order.

(2) The Clerk is directed to forward a copy of this Order to all counsel of record.

DATED this 29th day of July, 2009.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE